IN THE UNITED STATES DISTRICT OF COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL CASE NUMBER: |
| EDWIN ESTEBAN FLORES (3) | : | 1:19-CR-364-MHC-JSA |
| and | : | |
| JUAN CARLOS CARRENO- | : | |
| ROMERO (4) | : | |

## ORDER AND REPORT AND RECOMMENDATION

This case involves an alleged conspiracy to possess methamphetamine and heroin with intent to distribute. During the investigation, among other things, agents searched a residence allegedly used as a center of the drug trafficking operation and various cell phones, via warrant, and a vehicle, without a warrant. The agents also conducted video surveillance of the residence and obtained identifications of various defendants from alleged conspirators. After an evidentiary hearing and post-hearing briefs, the case is now before the undersigned on a variety of motions to suppress, and other motions. As explained below, the Court **DENIES** Defendant Carenno-Romero's Motion for Disclosure [100] and **RECOMMENDS** the denial of Defendant Carreno-Romero's and Edwin Flores's

Motions to suppress the result of the various searches and identifications [59][84][90][97][98][105][109][112].

## I.    FACTUAL BACKGROUND

### A. *Search Warrant For 1917 Bramlett Court*

According to the affidavit signed in support of the application for the search warrant of a residence at 1917 Bramlett Court, Tucker, Georgia [119]:

Law enforcement stopped a vehicle on January 25, 2019. *Id*. ¶ 19. Inside the car, the officers found 1 kilogram of heroin and 4.5 kilograms of cocaine in a metal cylinder. *Id*. A passenger (HM[1]) was arrested and interviewed and agreed to allow agents to review text messages in the WhatsApp application on his phone. Some of these messages referenced 1917 Bramlett Court, and the passenger explained that he had delivered other metal cylinders to that address approximately one week earlier. *Id*. The passenger disclaimed specific knowledge as to the contents of the cylinders delivered to 1917 Bramlett Court. *Id*.

Several months later, U.S. Drug Enforcement Agency agents in North Carolina arranged multiple undercover operations whereby an undercover agent arranged to purchase a total of approximately 7 kilograms from a suspect (JP[2]). *Id*.

---

[1] The passenger is named in the affidavit but for purposes of this document the Court will only use initials.

[2] The suspect is named in the affidavit but for purposes of this document the Court will only use initials.

¶ 22.  After arrest, the suspect was interviewed and told agents that, on April 23, 2019, he drove to 1917 Bramlett Court, parked his silver Toyota Camry there, was provided drugs by the occupants to deliver to North Carolina, and was provided another vehicle for that purpose. *Id*. ¶ 24. Agents traveled to 1917 Bramlett Court and were able to corroborate that the car described by JP was present there. *Id.* JP stated that 1917 Bramlett Court is where "they keep drugs." *Id*. ¶ 25. During the interview, JP's phone kept ringing, and he indicated that it was boss (as to whom JP supplied a first name that is identified in the affidavit). *Id*. ¶ 26. Pursuant to the agents' instructions, and in their presence, JP called the boss back. *Id*. The boss indicated that he was concerned because he had not heard anything, but JP assured him that the narcotics deal was completed and everything was fine. *Id*.

## B. *Evidentiary Hearing*

The Court convened an evidentiary hearing on Defendants' various motions to suppress evidence and identification on September 15, 2020. The affiant on the Bramlett Court search warrant, DEA Special Agent Raymond Devogt, summarized additional information as to the investigation. Agent Devogt explained that agents conducted surveillance of 1917 Bramlett Court after the January 2019 arrest of MH through April 2019. *See* Transcript [133] ("Tr.") at 9. According to Agent Devogt, "[w]e noticed that there was several individuals at the house. There were multiple adults along with multiple children at the house. We noticed there was also a white

van attached or that was parked at the house several times, and there was also

several other vehicles that were there as well." *Id.*

    1.  The Search of Bramlett Court, the Subsequent Arrest Of Defendants Carreno and Terrero, and the Vehicle Search

On April 25, 2019, agents executed the search warrant at 1917 Bramlett

Court. *Id.* at 9.

> During the execution of the search warrant, we went inside, inside the master bedroom. There was a methamphetamine conversion lab in which they were converting liquid methamphetamine and crystal methamphetamine. There was a kilo press in the master bedroom and master bath. There was also a screening station used to separate the crystal from the liquid methamphetamine. There were several canisters or metal tins of acetone, which is used in the methamphetamine-making process or the conversion process. There was also bank records found for [Defendant Edwin Flores] downstairs in what used to be the living room, or I'm sorry not the living room, it used to be the dining room area that was converted to a bedroom. And then there was a safe that contained cocaine, heroin and a pistol, sir.

*Id.* at 9-10. The agents found approximately 12 kilograms of methamphetamine. *Id.*

    The only person present in the house during the search was a nine-year-old

boy. *Id.* Through school records, the agents determined that the boy's mother was

Defendant Terrero. *Id.* at 11. According to school records, the two individuals

allowed to pick up the boy were Defendant Terrero as well as JP, the individual

who had been arrested in North Carolina after having obtained drugs at 1917

Bramlett Court. *Id.* at 12. Agents located and spoke to Defendant Terrero's sister,

who explained that Terrero had been involved with drugs for approximately one

year, that she was living at the Bramlett house, and that "she recently got a new

boyfriend." *Id.* at 12. Agent Devogt explained what happened next:

> We tried to contact Ms. Terrero, and an agent posed as a DFACS
> worker, made a ruse call to her stating that they needed to talk to her
> about her son and how they can meet up and get in contact. They set
> up a meeting time which was at the DFACS office in DeKalb County.
> On the same date, I believe, but prior to that, agents or TFO Kruger
> secured a warrant for her arrest for manufacturing methamphetamine
> in the presence of a minor out of DeKalb County. And then when she
> arrived at the DFACS office, she was subsequently arrested inside and
> interviewed by TFO Downey.

*Id.* at 13.

Defendant Terrero arrived at the DFACS office in a white van on April 25,

2019 driven by a man later identified as Defendant Carreno. *Id.* at 13-14.[3] The

agents confirmed that the van was registered to Defendant Terrero. *Id.* Although

agents engaged in the prior surveillance at 1917 Bramlett Court were unable to

identify any tag number for the white van that had been observed there, the

description of that van matched the one driven by Defendant Carreno on April

25th. *Id.* at 13-14.

Agent Devogt explained that because the van had been at the house, and

because Defendant Terrero had recently begun a romantic relationship with a new

---

[3] Agent Devogt's testimony refers to this event as occurring on April 26, 2019,
although all other evidence in the case suggests that the date was April 25. This
very minor discrepancy is not material to any issue but the Court will use the April
25th date.

boyfriend, "we figured that the person probably was driving the vehicle because of the relationship." *Id*. at 14. The agent also stated that they believed that whoever had been in the house would have had knowledge of the drug trafficking operation and methamphetamine production lab being operated out of there. *Id*. at 15.

DEA Task Force Officer George Smith testified more specifically as to the events that occurred at the DFACS office. Officer Smith, who had participated in the execution of the search at Bramlett Court, was sitting in his vehicle when Defendant Carreno dropped Defendant Terrero off at the DFACS office and then parked the white van next to Officer Smith's vehicle. *Id*. at 67-68. Instructions had been issued to detain any person who transported Defendant Terrero to the DFACS office that day, and so Officer Smith got out of his car, announced himself to Defendant Carreno, and said, with his weapon out, "hey, police, let me see your hands." *Id*. at 68-72. Another officer pulled a car in front of the van so that it could not leave. *Id*. Defendant Carreno complied and was detained. *Id*. at 68-69. Officer Smith was standing outside the passenger side of the white van, which had an open window. *Id*. Another Officer (Kruger) approached the driver's door and may have also pulled out his gun. *Id*.

At some point during this encounter, Officer Smith saw through this open window a glass pipe in the center console that appeared to be for smoking methamphetamine as well as a beer bottle. *Id*. at 68-70, Gov't Ex. 5. The officers

also observed that there were children sitting in the backseat of the van. *Id.* In

Officer Smith's experience, a pipe of this sort was for the purposes of smoking

methamphetamine or crack and was not typical of pipes used for smoking tobacco.

*Id.* at 71. Thus, after securing Defendant out of the car, the officers searched the

van, and found a second glass pipe, and a cigarette pouch containing suspected

methamphetamine or heroin. *Id.* at 71-73. Although not specifically mentioned in

the hearing, the parties also agree in their post-hearing briefing that two cell

phones later determined to belong to Defendant Carreno were found and seized in

the van (and subsequently searched after the investigators obtained a search

warrant for the phones).

### 2. Subsequent Identifications

Agent Devogt also described certain additional interviews that he conducted

of JP – the individual who had been arrested in April in North Carolina. In an

interview on May 8, 2019, JP explained that he had been the personal driver for

Elber Flores-Lopez (an unarrested Co-Defendant). *Id.* at 15. JP, who had been a

taxi or Uber driver, was paid $700 per week to drive Defendant Flores-Lopez

"around" and run "errands." *Id.* JP described other drug trafficking trips that he

took with or at Defendant Flores-Lopez's instructions. *Id.* at 16-17. When asked

about who lived at 1917 Bramlett Court, Agent Devogt explained that JP stated:

> stated that there was a female that lived in the master bedroom named
> Ms. Iveth, later learned to be Nidia Iveth Hernandez. Stated that Mr.

> Edwin lived downstairs, and that there was the kids living right next
> to the master bedroom that contained the meth lab, and that Mr.
> Carreno and Ms. Terrero lived in the room right next to that along
> with Ms. Maria -- I believe you referred to her as Lachina -- in the far
> right room with the extra storage area.

*Id*. at 17. JP further stated that Defendant Carreno (who JP knew by the nickname, "Poochy") was the boyfriend of Defendant Terrero, and that they were responsible for traveling to Houston to pick up the liquid methamphetamine and bring it back to the lab. *Id.* at 17, 42.

At the time of arrest, JP himself provided a copy of a photograph he had in his possession or was able to obtain of Defendant Edwin Flores. *Id*. at 19. Agents did not show JP any additional photographs during the interview on May 8, 2019, but then did so in a subsequent interview on May 30. *Id*. at 20. Specifically, during execution of the search at 1917 Bramlett Court, agents had discovered and obtained stored video images from a privately-installed security system (referred to as "Night Owl") inside the residence. *Id*. During the May 30, 2019 interview of JP, agents displayed multiple videos to JP of individuals walking around inside of the house. *Id*. As Agent Devogt explained, JP "was able to identify the people based on physical description, seeing the video, tattoos and things of that nature, sir." *Id*.

Agent Devogt explained that JP's level of certainty was very high in identifying the individuals depicted in that security footage: "He was very certain. He -- he didn't hesitate to name people, and then when I showed him pictures that -

- of people that are involved in the investigation that he didn't know about, he stated that he didn't know. So he wasn't making up information to please us." *Id*. at 21. JP was able to identify images of Defendant Edwin Flores and Defendant Carreno in these videos, as well as other individuals, and in some cases was able to explain what those persons were doing. *Id.* at 22-23; Gov't Exs. 2, 3. JP displayed "intimate knowledge of the house" and the details of the methamphetamine lab production facilities inside, and was able to give descriptions of the individuals, their vehicles, and where they worked. *Id*. at 21-22.

In addition to the identifications provided by JP on May 8 and May 30, Agent Devogt described an additional photographic identification of Defendant Edwin Flores obtained from an unidentified female witness on August 8, 2019. *Id*. at 29. On August 8, 2019, Agent Devogt showed this source a driver's license photograph of Edwin Flores, and the source confirmed with certainty and no delay that the photograph was of Mr. Flores. *Id*. at 29-31.

This unidentified source of information explained that she was friends with Edwin Flores. *Id*. As the source explained to Agent Devogt, "[t]he source would often visit the house. It was seen on video inside of the house. She was able to provide Facebook accounts, pictures of the subjects, or I'm sorry, of the defendants. Overall, she said that they were friends and that she had known them, I believe, since approximately January, maybe February of 2019." *Id*. at 29-30. She

was also able to explain the activity within the house and the participants' various

roles. *Id*. at 31 ("She was able to describe everybody who was previously

mentioned, where they stayed in the house, their roles. She was able to provide

phone numbers for the individuals inside the house. She showed -- she had

intimate knowledge of Mr. Elber and I believe it was Mr. Edwin's mother, stated

they had met, they had been friendly. So the -- the source had -- she was friendly

with them. She had a lot of information about the drug activity in the house, along

with their personal life, sir.")

## II.   DISCUSSION

### A. *Motion For Disclosure Of Informants [100]*

In a motion filed prior to the evidentiary hearing, Defendant Carreno-

Romero alleged:

> Discovery materials include reports of interviews with multiple unnamed
> Sources of Information who informed law enforcement officers that Mr.
> Carreno-Romero was a participant in a methamphetamine production and
> distribution operation being conducted from 1917 Bramlet Court in Tucker,
> Georgia. According to one report, a Source of Information interviewed in
> Raleigh, North Carolina on May 8, 2019 stated that Mr. Carreno-Romero
> was the boyfriend of Francheska Terrero and that he would drive with her to
> Houston, Texas to pick up liquid methamphetamine. According to a second
> report, a Source of Information interviewed on May 30, 2019 in Raleigh,
> North Carolina described activity shown on videos captured on a Night Owl
> recording system at 1917 Bramlet Court. The Source of Information stated
> that in one video Mr. Carreno-Romero received crystal methamphetamine
> and that in another video Elben Lopez took two bags of methamphetamine
> into a room that belonged to Mr. Carreno-Romero and Ms. Terrero and that
> Mr. Lopez departed the room without the methamphetamine. According to a
> third report, a Source of Information interviewed on August 8, 2019

described Mr. Carreno-Romero and Ms. Terrero as runners for the illicit drug activity. The Source of Information allegedly indicated that Mr. Carreno-Romero and Ms. Terrero made repetitive trips to Houston, Texas and would bring back random items, including a lot of plastic or glass bottles containing a liquid.

Motion [100] at 2-3.

Defendant thus requests that the Court order that the Government disclose the identity of these sources of information pursuant to the balancing test set forth in *Roviaro v. United States*, 353 U.S. 53 (2017).

The Government indicates that it has already revealed the identity of the source of information on May 8, 2019 and May 30, 2019, and that Defendant's request for such information is moot. Resp. [117] at 8. Indeed, as noted above, the Government has elicited testimony describing in detail the information provided by JP, who has been identified by name, on May 8 and May 30, 2019. Defendant does not dispute that these requests are moot.

The Government opposes Defendant's requests for disclosure of the source of information on August 8, 2019, however, on the grounds that Defendant has failed to meet his burden to show entitlement to such relief.

The standards for determining whether the identity of a confidential informant should be disclosed are governed by *Roviaro v. United States*, 353 U.S. 53 (1957) and its progeny.  In *Roviaro*, the Supreme Court affirmed the principle that the Government has a privilege "to withhold from disclosure the identity of

persons who furnish information of violations of law to officers charged with enforcement of that law." *Id*. at 59.  That privilege is limited, however, and when "an informer's identity, or . . . the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.  In determining whether the privilege must give way to protect the rights of a defendant a court must balance the interests of the public in protecting the flow of information in furtherance of the public's interest in effective law enforcement against a defendant's right to prepare his defense.  *Id.* at 62.  The factors to be weighed in balancing these competing interests have been outlined by the Eleventh Circuit as:  "the extent of the informant's participation in the criminal activity, the directness of the relationship between defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure."  *United States v. Gutierrez*, 931 F. 2d 1482, 1490 (11th Cir. 1991).

The Court finds that Defendant has not met his burden to require disclosure of the August 8th source of information. Although the Government has not identified this person, Agent Devogt has otherwise described her, explained her relationship with Defendant Flores and others, and the fact that she was present within the Bramlett Court residence (and captured on the Night Owl video images) at various times during the timeframe of the investigation.

The Government asserts, and Defendants offers no allegations to refute, that the individual was uninvolved with any drug trafficking activity and instead was a mere witness or tipster present to observe certain activity. [117] at 9. Defendant also provides no explanation as to why this individual's information would be helpful to his defense. His initial brief fails to address this source's statement in particular, and only conclusorily states that all of the sources' "testimony may serve to amplify or contradict the testimony of law enforcement offices or other witnesses concerning his involvement in the alleged offense conduct." [100] at 5. Defendant also failed to respond to the Government's opposition to provide any further explanation. Finally, the Government states that this source has provided ongoing information and exposure may expose the witness to harm, especially considering that at least one named defendant and potentially other co-conspirators remain at large. [117] at 10. Thus, the Court **DENIES** Defendant's Motion [100].

## B. *Motions Challenging Searches Based On Warrants*

1.  Search of 1917 Bramlett Court [90][107]

Defendants Flores and Carreno both challenge an April 23, 2019 search warrant for the residence located at 1917 Bramlett Court, Tucker Georgia on the grounds that the applications failed to show probable cause. *See* Motions [90][107].

A magistrate judge asked to issue a search warrant must make a practical decision, given all the facts set out in the application, that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213 (1983). Courts reviewing the sufficiency of warrant applications after-the-fact should not do so in a hyper technical manner; Rather, courts must employ a realistic and common-sense approach, to encourage recourse to the warrant process and to recognize the significant deference afforded to the decisions of the issuing judge. *Id.*; *United States v. Miller*, 24 F.3d 1357 (11th Cir. 1994). An affidavit that relies on informants or other confidential sources is judged like any other application. As the Supreme Court has explained:

> [The issuing judge is] simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed.

*Gates*, 462 U.S. at 238-39 (citation omitted).

Moreover, regardless of whether it would have issued the warrant, the reviewing court must deny suppression on the grounds of good faith reliance unless the affidavit and/or warrant were so facially deficient that official belief in the warrant's legality would be entirely unreasonable. *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002). "Good faith" is an objective standard determined by

what a reasonable police officer under the circumstances would perceive, not what a judge or other legal expert would perceive. *United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990). In other words, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *United States v. Leon*, 468 U.S. 897, 916, 919 (1984).

The above-stated facts were clearly sufficient to establish probable cause, or at least that the agents had a good faith basis to rely on the warrant. The investigators received statements from two separate individuals in apparently unrelated incidents several months apart, caught in the midst of drug trafficking activity, and which statements specifically identified 1917 Bramlett Court as the location where the individuals obtained drugs to traffic or delivered containers likely containing drugs. The information from JP was at least partially corroborated, as the officers were able to verify that JP's car was parked at Bramlett Court. JP was also already in custody for clear drug trafficking crimes, and likely knew that matters would only be worse if his statements about the presence of drugs at Bramlett Court were revealed to be baseless. As to MH, the information about Bramlett Court came not just from his own statements but from text messages found on his phone. This information was more than enough to establish probable cause to support the warrant. At a bare minimum, the warrant

application was not so lacking in factual support as to deprive the officers of any good faith basis to rely on the warrant.

Thus, the Court **RECOMMENDS** that the Motions to Suppress the results of the search warrants for 1917 Bramlett Court [90, 107] be **DENIED**.

2.  Carreno-Romero's Cell Phones [97]

Defendant Carreno-Romero separately moves to suppress the search of two cellular phones that were found within the search of his car shortly before his arrest on April 25, 2019, and which were subsequently searched pursuant to a warrant. *See* Motion [97]. Defendant does not argue that the warrant was unsupported by probable cause. Rather, Defendant argues that the facts supporting the affidavit came in part from evidence obtained as a result of the search of Bramlett Court, including footage from the security system inside that residence. Defendant argues that absent such evidence, the agents would have lacked probable cause to obtain a warrant to search his phones. Thus, according to Defendant, the search of the phones should be suppressed under the fruit-of-the-poisonous-tree doctrine, based on the alleged infirmity of the underlying warrant for 1917 Bramlett Court. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

The undersigned **RECOMMENDS** that this Motion [97] be **DENIED** because, as explained above, there is no infirmity in connection with the

underlying warrant for 1917 Bramlett Court. Since Defendant alleges no other

basis to challenge the cell phone warrant, the motion must be denied.

**C.** ***Defendant Carreno's Motion to Suppress Warrantless Search Of The Van* [59][84]**

Defendant Carreno also challenges the evidence obtained from the

warrantless search of the white van on April 25, 2019, in the DFACS parking lot.

As noted above, after Defendant Terrero arrived at DFACS in the wake of the

discovery of the methamphetamine lab at 1917 Bramlett Court, Officer Smith was

instructed to detain and question the driver (Defendant Carreno). But as he

approached the van and instructed Carreno to put his hands up, Officer Smith saw

drug paraphernalia and a beer bottle inside the car, along with minor children, and

thus initiated a full vehicle search. The Defendant argues that the police lacked

reasonable suspicion to initiate an investigative detention.

"It is a 'basic principle of Fourth Amendment law' that searches and

seizures inside a home [or other private property] without a warrant are

presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980);

*United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). Upon a motion to

suppress evidence garnered through a warrantless search and seizure, the burden of

proof as to the reasonableness of the search rests with the prosecution. *United

States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (*citing United States v.

Impson*, 482 F.2d 197 (5th Cir. 1973)). Thus, the government must demonstrate

that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Friere*, *supra*.

Police may also detain a suspect briefly for an "investigative stop" if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968). "Reasonable suspicion" requires a lesser quantum of factual support and certainty than does probable cause. *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990). Reasonable suspicion must, however, be more than just an "inchoate and unparticularized suspicion or hunch." *Id.*, 392 U.S. at 27. The officer must have "some minimal level of objective justification" taken from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). What is a "reasonable suspicion" is determined from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1 (1989), including the collective knowledge of the officers involved. *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). The "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Also, one well established exception to the need to have a search warrant to conduct a lawful search is the "automobile exception". Due to the mobility of vehicles, they may be searched without a warrant if the officers have probable cause to believe that the vehicle contains evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 149 (1925). In other words, no additional exigent circumstances need be present to search a vehicle lawfully without a warrant so long as the officers have probable cause. *Maryland v. Dyson*, 527 U.S. 465, 466-467 (1999). The warrantless search of a vehicle has been held reasonable if supported by probable cause, even if the vehicle has been removed to the security of a police department lot. *Chambers v. Maroney*, 399 U.S. 42 (1970); *United States v. Johns*, 469 U.S. 478 (1985). Finally, the right to conduct a warrantless search of a vehicle has been held to extend to the search of any containers found within the vehicle that may conceal the subject of the search. *United States v. Ross*, 456 U.S. 798 (1982).

The Court finds that Officer Smith possessed reasonable suspicion to justify an investigative seizure. At the point when Officer Smith approached the Defendant in the white van, he and the other members of the investigative team knew that Defendant Terrero had just arrived in the van in response to a ruse intended to facilitate her arrest; that Defendant Terrero, who was a methamphetamine user, resided in a house that was also a major methamphetamine

production lab and distribution site (1917 Bramlett Court); that a white van resembling the one Defendant had been driving had been seen at 1917 Bramlett Court during the investigation; that several other individuals had been observed at that same address; that Defendant Terrero was currently involved with someone described as a "boyfriend"; and that records obtained during the search of 1917 Bramlett Court earlier that same day showed the identity of at least one man who was living in the house.

In particular, the officers had discovered a substantial amount of methamphetamine and other evidence during the search. The officers also knew from JP and HM that multiple drug transactions occurred at the house. It was therefore reasonable to suspect that anyone residing or spending substantial time in the house could be part of the operation. It was likewise reasonable to suspect that the operators of a substantial methamphetamine lab and distribution center would not freely allow individuals to reside there who were not part of the conspiracy.

Based on these facts, the investigators reasonably suspected that the unknown man who drove Defendant Terrero to the DFACS ruse could have been involved in the conspiracy. Thus, the police had a reasonable basis to approach and briefly detain and question him. Further, as the officer was approaching a person associated with a suspected drug trafficker and suspected to be a potential co-conspirator, it was reasonable for purposes of safety for the officer to display a gun

and order the driver to show his hands. *See United States v. Gibbs*, 917 F.3d 1289, 1297 (11th Cir. 2019) ("[W]e have repeatedly held that the mere fact that an officer drew his weapon does not transform an otherwise lawful stop into an unlawful detention."); *United States v. Martin*,794 F.2d 1531, 1533 (11th Cir. 1986) (noting that guns "are 'tools of the trade' in drug trafficking").

Once Officer Smith approached the van, he saw a glass pipe likely used for methamphetamine and a beer bottle in the console area of the car. He also saw minor children in the backseat. Defendant does not argue that the evidence observed by Officer Smith was insufficient to establish probable cause, or that the white van (which had just driven into the parking lot) was not operable. Indeed, Defendant does not challenge the applicability of the automobile exception to justify a search of the white van. Instead, Defendant's sole argument is that this search constituted the fruit of an illegal investigative seizure. Because the Court finds that the seizure was proper, and because the automobile exception clearly and indisputably otherwise applies, Defendant's argument fails.[4]

_____

[4] The Government alternatively argues that, even if Officer Smith lacked reasonable suspicion, the Court should nonetheless deny suppression of the evidence found in the subsequent search under the attenuation doctrine. The Government cites *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016), for the proposition that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." According to *Strieff*, the Court should consider several factors to determine whether the "causal link" between any illegal activity and the discovery of evidence is too attenuated to justify suppression: (1) temporal proximity, (2)

## D. *Defendant Carreno's Motion to Suppress Video Surveillance*

Defendant Carreno also filed a Motion to Suppress Evidence From Warrantless Pole Camera Surveillance [112], which alleges that the investigators relied on surveillance footage of the exterior of 1917 Bramlett Court from a so-called "pole camera," i.e., a camera installed on a utility pole or other location on the street. Defendant separately requested that the Court continue the evidentiary hearing so that Defendant could fully review the pole camera footage and prepare to submit further evidence in support of the motion. *See* Motion [114]. The Court granted this Motion to Continue. *See* Order [115]. The Government subsequently filed a Motion to "Dismiss" the Defendant's Motion [118], in which the Government proffered that:

> [T]he pole camera was installed on or about February 26, 2019, in a public location within view the front of the residence at 1917 Bramlett Court. The camera only viewed the exterior of 1917 Bramlett Court

---

intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Id*. In a footnote, the Government also "preserves its ability to argue for application of the related doctrines of 'independent source' and 'inevitable discovery.'" Gov't Br. [155] at 11.

As to *Strieff*, however, the record is not sufficiently developed to allow any conclusion as to what Officer Smith might have seen in plain view had he not ordered Defendant to raise his hands. As to the other theories, it does not suffice to refer obliquely in a footnote to additional potential arguments not being asserted, for the purpose of "preserv[ing]" some future ability to do so. Thus, the Court does not recommend denying the Defendant's motion based on these alternative arguments that pre-suppose an illegal seizure. These alternative arguments are moot, however, in light of the undersigned's other recommendations.

and other neighboring residences. The public view of 1917 Bramlett
Court was not obscured or protected by any fence, wall or other
object. The agents could remotely zoon, pan and tilt the camera. But
the camera had no independent light source, could not record audio,
and possessed no enhanced infrared or other capability to record any
activity inside 1917 Bramlett Court. The camera was removed on or
about May 8, 2019.

118 [4] at n. 1.

Defendant has not disputed these assertions or otherwise responded to the

Government's Motion to Dismiss. No further evidence has been submitted and no

parties sought to submit further evidence related to this motion (or even brought up

this motion) during the hearing.

A defendant challenging the legality of a search bears the initial burden of

showing he has standing by proving he possessed an objectively reasonable

expectation of privacy in the area searched or items seized. *See Rehberg v. Paulk*,

611 F.3d 828, 842 (11th Cir. 2010) (citations omitted); *United States v. Baron–*

*Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (citation omitted). To establish a

reasonable expectation of privacy, the defendant must manifest a subjective

expectation of privacy in the items searched or seized, and society must be

prepared to recognize that expectation as legitimate or objectively reasonable.

*Rehberg*, 611 F.3d at 842 (citation omitted); *United States v. Miravalles*, 280 F.3d

1328, 1331 (11th Cir. 2002) (citation omitted). In other words, a defendant must

establish both a subjective and an objective expectation of privacy. *United States v. Segura–Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (citation omitted).

In this case, Defendant has done nothing more than allege that the investigators set up a surveillance camera at some third-party location to observe the exterior of 1917 Bramlett Court as it was seen from the street. Defendant does not allege that the photographs were taken from, and that the camera was installed on, any property for which Defendant had any interest. Defendant also does not allege that any camera utilized any unique technology, that the investigators gained a particularly unusual vantage point, or that the camera was able to somehow peer around or through obstructions and thereby see things not otherwise plainly observable to the public.

Most courts that have confronted the issue have rejected Fourth Amendment challenges as to pole or surveillance camera footage, on the grounds, among other things, that no reasonable expectation of privacy is implicated by a surveillance camera mounted on a third-party's property that sees nothing more than is plainly visible to any passerby. *See, e.g., United States v. Houston*, 813 F.3d 282, 289 (6th Cir. 2016); *United States v. Bucci*, 582 F.3d 108, 116-117 (1st Cir. 2009); *United States v. Mazzara*, 2017 WL 4862793 (S.D.N.Y. Oct. 27, 2017); *See generally Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth

Amendment protection."); *California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.")

Defendant cites the Supreme Court's decision in *Carpenter v. United States*, -- U.S. --, 138 S.Ct. 2206, 2214 (2018). This case is significantly distinguishable. The Supreme Court in that case addressed whether the Government could obtain historical cell site locational information for a cellphone, effectively tracking nearly all the user's movements with precision, for what amounted to roughly nine months.  The Court found that the ability to construct such a detailed and comprehensive log of a person's movements over such a long period, based only on the use of a device so ubiquitous in modern life, offended reasonable expectations of privacy.  On this basis, the Court found that a warrant is necessary to obtain such data.

In this case, by contrast, the pole camera only captured images of a single fixed location, that is, 1917 Bramlett Court. This camera did not track Defendant's movements. Rather, the camera may have shown times when Defendant entered and exited 1917 Bramlett Court, and some activity outside of the front of the house. Notably, Defendant offers no evidence that he was ever shown on such images much less any specific period when he was potentially subject to being

shown. In any event, this technique did not otherwise reveal any of Defendant's activities and hardly allowed investigators to compile the sort of comprehensive log of movements that concerned the Court in *Carpenter*.  Indeed, *Carpenter* itself made clear that it was a "narrow" decision that should not "call into question conventional surveillance techniques and tools, such as security cameras." 138 S.Ct. 2206, 2220.

Defendant cites a district court case from within another circuit, *United States v. Moore-Bush*, 381 F.Supp.3d 139, 142 (D.Mass. June 3, 2019), which applied *Carpenter* to suppress pole camera surveillance footage of a residence. This decision is the only authority presented by Defendant that has suppressed so-called pole camera footage. This decision was subsequently reversed on appeal by a panel of the 1st Circuit, *see United States v. Moore-Bush*, 963 F.3d 29 (2020), although that panel decision has in turn been vacated in favor of a still-pending *en banc* review, *see United States v. Moore-Bush*, 982 F.3d 50 (1st Cir. 2020).

Thus, at a minimum, the viability of *Moore-Bush* is an open question at this juncture. But, regardless, the facts of *Moore-Bush* are also distinguishable. In that case, the pole camera took video surveillance images of the defendant's residence for eight months. Here, Defendant offers no evidence. Although the Government proffered that the camera was in place at 1917 Bramlett Court for a total of approximately 2.5 months, there remains no evidence or allegations as to any

particular period of time in which Defendant was residing at the house and was captured in photographs. Indeed, as noted above, Defendant does not show any evidence that he was photographed at all. Even if *Carpenter* could be extended to pole camera footage of a residence in some situations, this is not one of those situations. For all these reasons, the Defendant's motion [112] should be **DENIED**.

### E. *Motions To Suppress Identifications*

Defendants Flores and Carreno also move to suppress certain out-of-court identifications made by potential witnesses during the investigation. [98][109]. Specifically, Flores moves to suppress the identifications of him based on the display of individual photographs by law enforcement to JP on May 8, 2019 and to the unidentified source of information described above on August 8, 2019. Both Flores and Carreno move to suppress the identifications that JP made of them on May 30, 2019, based on recorded footage obtained during the execution of the search warrant at 1917 Bramlett Court.[5]

In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Supreme Court explained that to show a constitutional infirmity, the defendant must show that the police used identification procedures "so impermissibly suggestive as to give rise

---

[5] Government counsel represented that the Government would not seek to introduce at trial certain other identifications that had been made and that were referenced in the Defendants' Motions. Tr. [133] at 4-5. Thus, the parties agreed that the issues before the Court are limited to the identifications stated above.

to a very substantial likelihood of irreparable misidentification." This standard is applied in a two-part test: (1) whether the identification procedures were unduly suggestive, and, if so, (2) whether, under the totality of the circumstances, the identification was reliable. *See Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991); *see also Neil v. Biggers*, 409 U.S. 188, 198-200 (1972). This test applies equally to in-court and out-of-court identifications. *Jones v. Kemp*, 794 F.2d 1536, 1539 (11th Cir. 1986).

If the identification process is determined not to be unduly suggestive, there is no need to proceed to the second part of the analysis and the inquiry ends. *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).  If, on the other hand, the process is determined to be unduly suggestive, a court must look at the totality of circumstances surrounding the identification, including:  the opportunity of the witness to view the perpetrator at the time of the crime, the witness's degree of attention, the accuracy of a prior description, the level of certainty of the witness, and the length of time elapsing between the crime and the identification.  *Biggers*, 409 U.S. at 199; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Blanco*, 943 F.2d at 508; *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984). These factors must be weighed against the corrupting effect of the suggestive identification itself. *Manson*, 432 U.S. at 114.

As to the first prong of the *Biggers* analysis, the identification of Defendant Flores by the confidential source of information on August 8, 2019 was unduly suggestive. Courts often find the display of a single photograph to a witness to be unnecessarily and unduly suggestive.  *See*, *e.g., Manson*, 432 U.S. 109. In this case, the investigators displayed a single driver's license photograph of Defendant Flores to the female source of information, to which the source responded, "yes, that's him." Tr. [133] at 29-31. This procedure ran the risk of leading the witness to identify the suspect under investigation. The Court has little hesitation in labeling this disfavored approach as unduly suggestive.

By contrast, Defendants have not shown that the procedures used to obtain identifications from JP on May 8 or May 30 were unduly suggestive. Although JP on May 8 identified a single photograph of Defendant Flores, it was a photograph that JP himself had previously supplied to the arresting officers. Tr. [133] at 19-20. This procedure was not leading or suggestive. On May 30, JP was asked to watch the "Night Owl" surveillance videos taken during the search at 1917 Bramlett Court, and if possible to identify who was depicted in those videos. Nothing about this procedure tended to lead or suggest to the witness than any particular image depicted any individual suspect. This technique raises no concerns under the first prong of *Biggers*.

The issue of reliability under the second prong of *Biggers* is the closest and most relevant with regard to the unnamed female source of information's identification of Defendant Flores in August, 2019. The Court has already found this identification to have been the subject of an unduly suggestive single photo show-up-style procedure. This identification also occurred several months after any activity in 1917 Bramlett Court and the Government elicited no evidence as to any ongoing further contact after the execution of the search warrant between this witness and Movant (Defendant Flores). Further, while the agent testified that the witness "had intimate knowledge of [Defendant Elber Flores-Lopez]," Tr. [133] at 31, there was no evidence elicited of any specific relationship with the Movant. That the Government, which has the burden of proof on the issue of reliability under the second prong of *Biggers,* declined to identify the witness also weighs against a finding of reliability.

On the other hand, Agent Devogt's testimony explained specific facts as to the witness's basis for knowing Defendant Flores's identity and the witness's knowledge of details of the individuals associated with 1917 Bramlett Court. This was far from the fleeting recollection of a victim or passerby otherwise unfamiliar with the suspects. The evidence showed that the source was personally and significantly familiar with the occupants of 1917 Bramlett Court. *See* Tr. [133] at 29-31 ("The source would often visit the house … She was able to provide

Facebook accounts, pictures of the subjects, or I'm sorry, of the defendants. Overall, she said that they were friends and that she had known them, I believe, since approximately January, maybe February of 2019.").

The investigators could corroborate the witness's basis of knowledge, as the Night Owl surveillance footage apparently showed her to be present. The witness was also able to explain the activity within the house and the participants' various roles. *Id*. at 31 ("She was able to describe everybody who was previously mentioned, where they stayed in the house, their roles. She was able to provide phone numbers for the individuals inside the house. She showed -- she had intimate knowledge of Mr. Elber and I believe it was Mr. Edwin's mother, stated they had met, they had been friendly. So the -- the source had -- she was friendly with them. She had a lot of information about the drug activity in the house, along with their personal life, sir.") Finally, the witness was "very positive" in her identification of Movant. *Id*. at 31 ("she didn't delay, she didn't have to think about it.")

In the end, while the agents could have used a less suggestive procedure, the totality of the evidence in the record contains sufficient indicia of reliability to avoid a constitutional issue as to the August 8, 2019 identification. Suppression should be denied.

The reliability of JP's identifications under the second prong of *Biggers* is unnecessary to assess as the undersigned has found that the Defendants have not met their initial burden to show suggestiveness. However, in the alternative, the Court easily finds sufficient indicia of reliability as to these identifications as well. JP was able to explain in detail who lived at 1917 Bramlett Court and where. *Id*. at 17. He displayed "intimate knowledge of the house" and the details of the methamphetamine lab production facilities inside, and was able to give descriptions of the individuals, their vehicles, and where they worked. *Id*. at 21-22. JP, who was a co-conspirator, was able to specifically discuss Defendants Terrero's and Carreno's role in transporting drugs to Texas. *Id*. at 17. JP expressed high levels of confidence in making his identifications and, perhaps even more importantly, candidly stated when he could not tell who was depicted in a particular photograph or video. *Id*. at 21. JP's identifications were also relatively recent. He was asked to identify Defendant Flores by photograph on May 8, which was approximately two weeks after JP had last been at 1917 Bramlett Court, and he was asked to identify individuals depicted in the Night Owl security footage just a few weeks later. Because that security footage only included the most recent 14 or 15 days prior to the execution of the search warrant, JP was displayed images that were approximately 45 days old or less. These are all strong suggestions of

reliability that would warrant denying suppression, even if the identification procedures were found to be suggestive.

## III.   CONCLUSION

Thus, the Court **DENIES** Defendant Carenno-Romero's Motion for Disclosure [100] and **RECOMMENDS** the denial of Defendant Carreno-Romero's and Edwin Flores's Motions to suppress the result of the various searches and identifications [59][84][90][97][98][105][109][112].

With no other matters before the undersigned, this case is **READY FOR TRIAL**.

**SO ORDERED** This 5th day of February, 2021.

_____
**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**